No. 3224

Second Circuit

MONROE GROCER CO., LIMITED, v. HODGE

(May 8, 1929. Opinion and Decree.)

Munholland & Munholland, of Monroe, attorneys for plaintiff, appellee.

Tobin R. Hodge, of Rayville, attorney for defendant, appellant.

REYNOLDS, J. Plaintiff, Monroe Grocer Company, Limited, sued to recover judgment against defendant, W. J. Hodge, on a promissory note for $2,249.40 signed by him, dated February 20, 1923, drawn payable to the order of plaintiff on November 1, 1923, and bearing interest at the rate of 8 per cent per annum from January 1, 1923, and stipulating payment of 10 per cent on principal and interest, as attorney's fees, if placed in the hands of an attorney for collection, less the following credits, namely: January 5, 1925, $807.92; June 20, 1925, $15; July 11, 1925, $15; August 11, 1925, $15; September 30, 1925, $15; October 31, 1925, $15; November 30, 1925, $15; December 30, 1925, $15; December 31, 1925, $30; July 14, 1926, $90; July 31, 1926, $15; August 31, 1926, $15; September 30, 1926, $15; and October 30, 1926, $15.

Plaintiff alleges that the note was lost and that its loss was duly advertised. An alleged copy of the note is attached to the petition as a part thereof. In addition to the credits recited above, it bears indorsement of an additional credit of $15 under date of May 9, 1925.

The prayer is for judgment for the amount of principal and interest and attorney's fees owing on the note, less the credits mentioned other than that of $15 under date of May 9, 1925.

Defendant admitted execution and delivery of the note and pleaded payment. He alleged that on January 5, 1925, plaintiff received from him a stock of general merchandise in part payment of the note to the extent of $807.92, and that in further part payment of the note to the extent of $1,500 he transferred to plaintiff on November 4, 1924, lots 4, 5, 6 and 7 of block B of the town of Calhoun in Ouachita parish, La. And he further alleges that these transfers of property "and other amounts paid by your defendant prior to January 5, 1925, represented by certain chattel mortgage notes and crop lien pledges" transferred by him to plaintiff to secure the payment of the note sued on "and collected by plaintiff more than paid the note."

In respect to the whereabouts of the note, he "avers that it has always been his custom to destroy cancelled or paid notes and that it is his recollection that the note herein sued on was returned to him by the plaintiff company on or about the day the $872.92 was paid, or shortly thereafter, and that same was destroyed, so he therefore avers on account of said belief that said note was destroyed by him when the plaintiff returned it to him."

On these issues the case was tried, and there was judgment in favor of the plaintiff and against the defendant for the principal and interest owing on the note, less the credits allowed by plaintiff, not, however, including the credit of $15 under date of May 9, 1925, and for 10 per cent on the balance owing on the note, as attorney's fees.

From this judgment the defendant has appealed.

## OPINION

In respect of the credits claimed by defendant for amounts alleged to have been collected by plaintiff on chattel mortgage notes and crop lien pledges deposited with it by defendant as security for the payment of the note sued on, there was a com-

plete failure of proof, and therefore nothing can be allowed him on that score.

And the credit of $807.92 of date January 5, 1925, being conceded by plaintiff, there remains for our consideration the claim of a credit of $1,500 of date November 4, 1924, for real estate alleged to have been transferred by defendant to plaintiff on that date.

The record shows that by an act executed before one of the deputy clerks of the clerk of the Fourth judicial district court of Louisiana in and for the parish of Ouachita defendant transferred to plaintiff for a recited consideration of $1,500 the immovable property described above. The deed was filed for record on the day it was executed, to-wit, February 4, 1924, and was signed by defendant. It was not, however, signed by any one on behalf of plaintiff accepting it.

It is contended by plaintiff that the execution of the deed and the filing of it for record was not authorized by it, and that it never subsequently accepted the transfer either expressly or by implication.

Defendant was engaged in the mercantile business in the town of Calhoun and owned the stock of merchandise he transferred to plaintiff and also the immovable property in question. He was insolvent, and plaintiff was seeking to collect the note sued on. Plaintiff was interested in the business success of S. A. Boyd & Son of Calhoun, a partnership engaged in the mercantile business there, and desired to facilitate the partnership in acquiring ownership of defendant's stock in trade and his storehouse and lots, being the ground above described. Plaintiff did acquire the stock in trade by datien en paiement at the price of $807.92 as above mentioned, and sold it to S. A. Boyd & Son, who continued under their own name in the same store building the business formerly conducted there by defendant.

Regarding the circumstances under which he executed the deed to plaintiff and filed it for record, defendant testified:

"Q. Why did you place on record a deed to the Monroe Grocer Company covering a building and four lots in the town of Calhoun? Why did you execute that deed and have it recorded?
"A. From instructions that I received from Mr. Washburn."

Mr. W. M. Washburn, to whom the witness referred, was the secretary and treasurer of the plaintiff company.

"Q. What were his instructions?
"A. I owed the Monroe Grocer Company a note. Mr. Washburn had charge of the note, and he approached me to buy this Calhoun property. We agreed on the price, provided they could get the titles and things straightened up. There were some mortgages against it. So, after we got in communication with some of the heirs in regard to the condition of the title, I went to see Mr. Caspari at the Monroe Dry Goods Company with reference to a mortgage they held, and Mr. Caspari told Mr. Herring to look up the records. After a week or ten days had elapsed, Mr. Caspari, who represents the Monroe Dry Goods Company, told me that he would like to purchase the property, but I told him that Mr. Washburn had the preference. After Mr. Caspari made the proposition to purchase this property, I rang Mr. Washburn and Mr. Washburn told me that he would buy it; so I told him 'all right,' that I was carrying Mr. Caspari out to see the Skipper place and let him have that property to apply on the note with them. I told him that I had agreed to let the Monroe Hardware Company have what I call the Brownlee property; so Mr. Washburn told me it was 'all right.' I carried Mr. Caspari out to see this property, sold it to him, and came back and did what Mr. Washburn told me to do. I had a deed made to Monroe Grocer Company for the property at Calhoun, and I made the Monroe Dry Goods Company a deed for the Skipper property.
"Q. What did Mr. Washburn tell you to

do when you went around and had this deed recorded?

"A. Well, he told me to go ahead and have the deed drawn up and recorded.

"Q. Yes. Did you do it?

"A. I did.

"Q. Did you have the deed recorded?

"A. I did.

\* &ast; &ast; &ast;

"Q. Have you exercised any control, or any acts of ownership over the house and lot occupied by Boyd & Son at Calhoun since you filed this deed for record?

"A. None whatever since the first of January, 1925.

"Q. Why did you stay in there until January 1st, 1925?

"A. The understanding was, when I sold him the property, that I was to have the use of the building until the first of January, 1925.

"Q. Who has exercised acts of ownership and control over this property since January 1st, 1925?

"A. I couldn't say, unless the Monroe Grocer Company has.

"Q. So far as you know, they are the only ones that have exercised any rights of ownership?

"A. As far as I know."

S. A. Boyd testified that he was a member of the partnership of S. A. Boyd & Son and that his firm occupied the immovable property in question.

"Q. How long has your firm been in that building, Mr. Boyd?

"A. Since the first of 1925 I believe it is.

"Q. From whom did you rent that building?

"A. &ast; &ast; &ast; Yes, I guess I rented it from Mr. Washburn. No price was understood though at the time I rented it."

He said that he rented it in the latter part of December, 1924, and that the transaction took place in the Monroe Grocer Company's place of business in Monroe.

"Q. When did you have your second conversation about the renting of that building?

"A. The same day I believe.

"Q. Did you trade with him the second time?

"A. Yes, sir.

"Q. How much rent did you agree to pay him?

"A. Fifteen dollars; that was agreed.

"Q. Did Mr. Washburn offer to sell you the property?

"A. Yes, sir.

"Q. About how many times?

"A. I don't recollect how many times.

"Q. More than one time?

"A. Yes, sir.

\* &ast; &ast; &ast;

"Q. Did he come to see you about it or did you go to see him about it?

"A. He came out there one time, maybe twice.

\* &ast; &ast; &ast;

"Q. Did he tell you, when you were in his office, that he had a good title to it?

"A. He told me one time that he thought he had a good title to it. &ast; &ast; &ast;

"Q. Did he say anything about Doctor Hodge having any interest in that property?

"A. No; I don't remember that he did.

\* &ast; &ast; &ast;

"Q. Did you ever &ast; &ast; &ast; pay Doctor Hodge any of the rents?

"A. No, sir.

"Q. Did he ever make any demand on you for the rents?

"A. No, sir.

"Q. Did you ask him anything about fixing the building?

"A. No, sir.

"Q. Who paid for the repair of the building, if you know?

"A. I don't remember. Seems to me it was charged back to us and taken out of the rents."

Prentiss Boyd testified that he was a member of the firm of S. A. Boyd & Son, and that the firm bought the Hodge stock of goods and rented the Hodge store property from the Monroe Grocer Company.

"Q. Now with whom have your transactions with reference to the building been since then?

"A. Mr. Washburn of the Monroe Grocer Company.

"Q. Has Doctor Hodge exercised any rights of ownership over that building?

"A. No, sir.

"Q. Has he attempted to collect any rents from you?

"A. No, sir."

He further testified that he complained to Mr. Washburn about the roof of the store leaking, and that Mr. Washburn sent roofing material to him and instructed him to have the roof repaired.

"Q. Did you ever say anything to Doctor Hodge about repairing that roof?

"A. No, sir.

\* \* \* \*

"Q. Now, did Mr. Washburn ever talk to you about selling the building?

"A. Yes, sir. Well, yes, he did talk about selling it, once."

He said that Mr. Washburn offered him the property for $1,300, and that Mr. Washburn said he did not think there was any doubt about the title being good.

Joe Hanna testified that he was the assessor of Ouachita parish, and that the assessment rolls of the parish for the years 1925, 1926, and 1927 showed lots 4, 5, 6, and 7 of block B of the town of Calhoun assessed to Monroe Grocer Company, Limited, and not to any one else; that he assessed the property to the Monroe Grocer Company, Limited, because the conveyance records showed the deed from defendant to plaintiff.

Mr. Washburn testified:

"Q. When did you agree, though, to take over certain of his property?

"A. In the early part of October, 1924, I agreed to take over the store building, provided the title was made good.

"Q. Did you make that offer in the form of a letter?

"A. No; the whole deal was verbal.

\* \* \* \*

"Q. \* \* \* Now your proposition was based on the title being good and free from encumbrances, was it not?

"A. It was.

"Q. And at what price?

"A. Fifteen hundred dollars.

"Q. Mr. Washburn, did you, as secretary and treasurer of the Monroe Grocer Company, instruct Dr. W. J. Hodge to go to the Clerk's office and make you a deed to that property at that price?

"A. I told Dr. Hodge to go to the Clerk's office, investigate the title and bring. me a record of the title.

"Q. Did he bring you evidence that the mortgage shown by that mortgage certificate had been cancelled?

"A. He brought me this certificate of mortgages, showing that certain mortgages had to be cancelled, and also a memorandum showing a missing link in the title.

"Q. And didn't you afterwards secure that missing link and have it recorded in the Clerk's office of Ouachita parish?

"A. I did.

\* \* \* \*

"Q. Mr. Washburn, haven't you had the building repaired out there since you had the deed?

"A. Some repairs were made on the building and paid for out of the rent.

"Q. Didn't you pay for those repairs?

"A. Yes, sir; and received the rent.

"Q. Haven't you tried to sell that building since this deed has been recorded?

"A. I tried to negotiate a sale, yes.

"Q. You tried to negotiate a sale? For whom?

"A. For the Monroe Grocer Company, provided the title was made to the Monroe Grocer Company."

On July 16, 1926, the Monroe Grocer Company, Limited, wrote S. A. Boyd & Son as follows:

"We enclose a memorandum showing six months' rent due on the building at Calhoun, amounting to $90.00. It seems that we have overlooked sending you a bill each month, for this rent, and you, in turn, have overlooked sending us a check for it.

"Would like very much to make a trade with you for the building, along the lines of the offer made by the writer the early part of the year, and if you are now ready to make the trade, we can let this rent apply as a part payment. Please let us know what decision you have reached, and, in the event you have not decided to buy the

building, please give us a check for the rent."

This letter was signed: "Monroe Grocer Company, Limited, by W. M. Washburn, Secretary-Treasurer."

Plaintiff's acts in relation to the property after the deed was executed were acts of ownership and are explicable on no other theory than that plaintiff considered itself to be the owner of it. Washburn, plaintiff's secretary and treasurer, says plaintiff was willing to take the property at a valuation of $1,500 in part payment of the note, conditioned on the title being good and free of mortgages. Inasmuch as defendant was insolvent and plaintiff was taking it in part payment of a debt that it might not otherwise be able to collect, and inasmuch also as plaintiff if sued by a mortgagee in a hypothecary action or claimant in a petitory action might call defendant in warranty, and if evicted from the property have a claim against him for the $1,500 at least as valuable as that represented by the note sued on, it is reasonable to believe that, as testified to by defendant, plaintiff was willing to take a transfer of the property with such title as defendant possessed. Support of this view is found in the fact that plaintiff itself took no steps to obtain an abstract of the title or a mortgage certificate or to have the validity of defendant's title inquired into by a lawyer or to have a deed from defendant to it drawn by a notary, but left these things to be done for it by the defendant himself. As shown by quotations from his testimony, Washburn told defendant to go to the "clerk's office, investigate the title, and bring me (Washburn) a record of the title," and he says that defendant, pursuant to these instructions, brought him a certificate of mortgages showing certain mortgages on the property and also a memorandum showing a link in the chain of title missing. Defendant says that Washburn also told him to execute and file for record a deed from him to plaintiff of the property. After the deed was executed plaintiff busied itself in obtaining the missing link and having it put on record. Why it should incur this trouble and expense if it did not own the property is not explained.

The mortgage certificate referred to was dated October 20, 1924. It shows judgments recorded against a former owner of the property aggregating, exclusive of interest and costs, $311.

One of these judgments is dated September 1, 1926; the second, June 16, 1917; and the third, October 20, 1917.

The judgment in this case was rendered on December 3, 1927, more than 10 years after the date of the last judgment above mentioned.

From the fact that the property was not seized and sold under any one of the judgments and that they were allowed to prescribe, it is reasonable to suppose that they had been satisfied. Anyway, all three of them were prescribed when the judgment appealed from was rendered.

But plaintiff insists that Washburn was without authority to make the alleged trade with defendant even if it be conceded that he did make it. It urges that corporations can be bound only by authority of their boards of directors, and that it does not appear that any resolution of the board of directors of plaintiff authorized Washburn to bind it in the premises, and it points to the fact that the deed was not signed in plaintiff's name as purchaser as proof that the transfer was never accepted by plaintiff.

Acceptance of a transfer may be shown otherwise than by the signature of the transferee to the act of transfer. Acts of dominion by the transferee over the property transferred will suffice to show it. It was said in Megason v. Boleyn Lumber Co., 140 La. 431, 73 So. 257, that the going into possession by the purchasers of land shows an acceptance of the deed by them, which supplies the absence of their signatures thereto.

And in respect of the authority of plaintiff's secretary and treasurer to bind plaintiff in the premises, we do not understand it to be contended by plaintiff that its secretary and treasurer was without authority to do so, but only that he did not in fact do so. However, even if the former were the contention, in view of plaintiff's acts of dominion over the property transferred it must be deemed to have consented to the transfer.

The judgment appealed from is erroneous in allowing defendant credit for rents collected by plaintiff and in not allowing him credit for the price of the immovable property. However, it is not necessary to reverse the judgment, but only to recast it.

It is therefore ordered, adjudged, and decreed that the plaintiff, Monroe Grocer Company, Limited, have judgment against defendant, W. J. Hodge, in the sum of $2,249.40 with interest thereon at the rate of 8 per cent per annum from January 1, 1923, and for 10 per cent on the amount of principal and interest, as attorney's fees, less a credit of $807.92 as of date January 5, 1925, and also less a credit of $1,500 as of date November 4, 1924.

It is further ordered, adjudged, and decreed that defendant pay the costs of the lower court, and plaintiff those of this court.